IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FORT SMITH DIVISION

SHERYL WINBERRY                                                              PLAINTIFF

        v.                          Civil No. 14-2182

CAROLYN COLVIN, Commissioner
Social Security Administration                                               DEFENDANT

## MEMORANDUM OPINION

      Plaintiff, Sheryl Winberry, brings this action under 42 U.S.C. § 405(g), seeking judicial review of a decision of the Commissioner of Social Security Administration (Commissioner) denying her claims for a period of disability, disability insurance benefits ("DIB"), and supplemental security income ("SSI") under Titles II and XVI of the Social Security Act (hereinafter "the Act"), 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). In this judicial review, the court must determine whether there is substantial evidence in the administrative record to support the Commissioner's decision. *See* 42 U.S.C. § 405(g).

**I.**    **Procedural Background:**

      Plaintiff filed her applications for DIB and SSI on March 5, 2008, alleging an onset date of January 1, 2006, due to depression, thyroid problems, a pinched nerve in the right shoulder, carpal tunnel syndrome of the right wrist, migraine headaches, dyslexia, black outs, confusion, dizziness, and degenerative disk disease ("DDD") resulting in back pain. Tr. 146-155, 174, 183-184, 213-214, 237. The Commissioner denied Plaintiff's applications initially and on reconsideration. An Administrative Law Judge ("ALJ") held the first administrative hearing on September 16, 2009, following which he entered an unfavorable decision. Tr. 17-52, 60-71, 550-563, 614-649. Plaintiff appealed the decision to this court, resulting in a remand order in June 2011. Tr. 595-607. The ALJ held a supplemental hearing on December 28, 2011, after which he entered a second unfavorable decision. Tr. 569-591. This court again remanded the case on February 11, 2013, due to the ALJ's failure to follow the directives of our first remand order. The ALJ held a third hearing on February 19, 2014. Tr. 890-925. Plaintiff was present and represented by counsel.

The Plaintiff possessed a high school education and had completed "[v]arious courses through Homeland Security (hazardous materials, etc.), Crawford County, [and] Hot Springs, AR." Tr. 175, 180. Plaintiff had past relevant work ("PRW") experience as a daycare worker, flower shop delivery driver, and home health aide. Tr. 175, 180, 193-200.

On June 30, 2014, the ALJ found Plaintiff's fibromyalgia, personality disorder, cognitive disorder, depression, anxiety, DDD, right shoulder pain, knee pain, and ADHD were severe, but did not meet or medically equal one of the listed impairments in Appendix 1, Subpart P, Regulation No. 4. Tr. 868-870. After partially discrediting Plaintiff's subjective complaints, the ALJ determined that Plaintiff retained the residual functional capacity ("RFC") to perform sedentary work except

> The claimant can occasionally operate foot controls, climb, balance, crawl and stoop, but cannot crouch or kneel. In addition, the claimant must avoid concentrated exposure to vibrations, fumes, dusts, gases, humidity and wetness. Nonexertionally, the claimant can perform simple, routine and repetitive tasks in a setting where interpersonal contact is incidental to the work performed; the complexity of tasks is learned and performed by rote, with few variables and little judgment; and the supervision is simple, direct and concrete.

Tr. 871. The ALJ then found Plaintiff could perform work as a laminator I. Tr. 880.

Subsequently, Plaintiff filed this action. ECF No. 1. This case is before the undersigned by consent of the parties. ECF No. 7. Both parties have filed appeal briefs, and the case is now ready for decision. ECF Nos. 12, 13.

**II.     Applicable Law:**

This court's role is to determine whether substantial evidence supports the Commissioner's findings. *Ramirez v. Barnhart*, 292 F.3d 576, 583 (8th Cir. 2002). Substantial evidence is less than a preponderance but it is enough that a reasonable mind would find it adequate to support the Commissioner's decision. We must affirm the ALJ's decision if the record contains substantial evidence to support it. *Edwards v. Barnhart*, 314 F.3d 964, 966 (8th Cir. 2003). As long as there is substantial evidence in the record that supports the Commissioner's decision, the court may not reverse it simply because substantial evidence exists in the record that would have supported a

contrary outcome, or because the court would have decided the case differently. *Haley v. Massanari*, 258 F.3d 742, 747 (8th Cir. 2001). In other words, if after reviewing the record it is possible to draw two inconsistent positions from the evidence and one of those positions represents the findings of the ALJ, we must affirm the decision of the ALJ. *Young v. Apfel*, 221 F.3d 1065, 1068 (8th Cir. 2000).

It is well established that a claimant for Social Security disability benefits has the burden of proving her disability by establishing a physical or mental disability that has lasted at least one year and that prevents her from engaging in any substantial gainful activity. *Pearsall v. Massanari*, 274 F.3d 1211, 1217 (8th Cir.2001); *see also* 42 U.S.C. § § 423(d)(1)(A), 1382c(a)(3)(A). The Act defines "physical or mental impairment" as "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § § 423(d)(3), 1382(3)(c). A Plaintiff must show that his or her disability, not simply their impairment, has lasted for at least twelve consecutive months.

The Commissioner's regulations require her to apply a five-step sequential evaluation process to each claim for disability benefits: (1) whether the claimant has engaged in substantial gainful activity since filing his claim; (2) whether the claimant has a severe physical and/or mental impairment or combination of impairments; (3) whether the impairment(s) meet or equal an impairment in the listings; (4) whether the impairment(s) prevent the claimant from doing past relevant work; and, (5) whether the claimant is able to perform other work in the national economy given his age, education, and experience. *See* 20 C.F.R. § § 404.1520(a)- (f)(2003). Only if the final stage is reached does the fact finder consider the plaintiff's age, education, and work

experience in light of his or her residual functional capacity.  *See McCoy v. Schweiker*, 683 F.2d 1138, 1141-42 (8th Cir. 1982); 20 C .F.R. § § 404.1520, 416.920 (2003).

**III.**     **Discussion:**

Plaintiff raises four issues on appeal:  1) The ALJ failed to follow the directives of this court by further investigating her personality disorder; 2) The ALJ failed to consider Listing 12.08; 3) The ALJ made an inaccurate RFC determination; and, 4) The ALJ improperly concluded the Plaintiff could perform work that exists in significant numbers in the national economy.  We disagree.  The Court has reviewed the entire transcript.  The complete set of facts and arguments are presented in the parties' briefs and the ALJ's opinion, and are repeated here only to the extent necessary.

**A.  Failure to Follow the Directives of this Court:**

In her first argument, the Plaintiff contends that the ALJ failed to obey the mandates of the remand order for the following reasons:  1) he failed to send a medical request form to Western Arkansas Counseling and Guidance Center ("WACGC") that met HIPPA requirements; 2) he failed to follow-up with Day Spring to find out where the doctor might now be working; and 3) he failed to ask Dr. Efird to complete an RFC assessment.  For the reasons enumerated below, we find no error.

The agency must comply with a federal district court's mandate in the court's remand order.  *See Sullivan v. Hudson*, 490 U.S. 877, 885-886 (1989) (deviation from the court's remand order in the subsequent administrative proceedings is legal error); *United States v. Bartsch*, 69 F.3d 864, 866 (8th Cir. 1995) (the law of the case doctrine is often used interchangeably with closely related mandate rule for the principle that a lower tribunal must scrupulously follow the mandate of the reviewing court on remand).  To fulfill the mandate, the inferior court is bound to

4

follow both the letter and spirit of the remand.  *See Thornton v. Carter*, 109 F.2d 316, 320 (8th Cir. 1940).

Here, the "spirit of the remand" was to allow the ALJ to develop the record further with regard to the Plaintiff's personality disorder.  Specifically, the Court directed the ALJ to obtain RFC assessments from the Plaintiff's treating psychiatrist and counselor.  In determining whether an ALJ has fully and fairly developed the record, the proper inquiry is whether the record contained sufficient evidence for the ALJ to make an informed decision. *Haley v. Massanari*, 258 F.3d 742, 749-50 (8th Cir. 2001); *Anderson v. Shalala*, 51 F.3d 777, 779 (8th Cir. 1995).

On remand, the ALJ attempted to recontact the Plaintiff's treating counselor and psychiatrist at Day Spring, but Day Spring advised him that they no longer employed either of these providers.  Tr. 1108-1109.  Further, the notice indicated that Day Spring had not treated the Plaintiff in 3 years.  The ALJ also attempted to obtain an RFC assessment from WACGC, but received notification that the consent form did not meet HIPPA requirements.  However, the notice also stated that their therapists and doctors do not complete these type forms.  Tr. 1114-1122, 1124-1131.

In May, 2014, the ALJ forwarded a copy of the responses to the Plaintiff's counsel, advising him that he could request a supplemental hearing or request a subpoena to require the attendance of witnesses or the submission of records.  Tr. 1087-1088.  However, counsel failed to respond or submit a request.  As such, we find that the ALJ properly followed the mandate of this Court.  The fact that the providers could not or would not complete an RFC assessment is a factor beyond his control.

Further, contrary to the Plaintiff's argument, we do not find that the ALJ had a duty to track down the psychiatrist and counselor that treated the Plaintiff at Day Spring.  This would be futile,

and certainly not in the best interest of justice.[1] The ALJ did order a consultative exam with Dr. Terry Efird. On September 12, 2013, Dr. Efird completed an RFC assessment. Tr. 1098-1109. Accordingly, we find that the ALJ complied with the "spirit of the remand order" by attempting to develop the record further regarding the Plaintiff's personality disorder.

Moreover, after reviewing the record, we find that it was fully and fairly developed with regard to the Plaintiff's mental impairment. It contains records dated February, 2007 through May, 2008 documenting the Plaintiff's treatment for depression at WACGC and treatment notes from September, 2008 through May, 2009 and October, 2009 through August, 2011 evidencing her treatment at Day Springs. Tr. 356-369, 405-414, 452-482, 517-543, 703-761. Further, Plaintiff's counselor at Day Spring, John Skelly, provided an assessment of her mental limitations in September, 2009. Tr. 513-516. Susan Smith, a counselor at WACGC also completed an RFC assessment in September, 2008. Tr. 404, 413. Additional records from Dr. Kathleen Kralik indicate that she conducted a mental evaluation in April, 2008. Tr. 254-260. These assessments, coupled with the assessment of Dr. Efird conducted in 2013, provide a sufficient basis for the ALJ's decision.

**B. Listing 12.08:**

In her second argument, the Plaintiff contests the ALJ's purported consideration of Listing 12.08. It defines personality disorder as the existence of inflexible and maladaptive personality traits that cause either significant impairment in social or occupational functioning or subjective distress. *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.08. The listing is met when the requirements of both A and B are met.

    A. deeply ingrained, maladaptive patterns of behavior associated with one of the following:

---

[1] We do note, however, that the Plaintiff's attorney could have attempted this task.

6

      1. seclusiveness or autistic thinking; or
      2. pathologically inappropriate suspiciousness or hostility; or
      3. oddities of thought, perception, speech, or behavior; or
      4. persistent disturbances of mood or affect; or
      5. intense and unstable interpersonal relationships and impulsive and damaging behavior; AND
    B. resulting it at least two of the following:
      1. marked restriction of activities of daily living; or marked difficulties in maintaining social functioning; or
      2. marked difficulties in maintaining concentration, persistence, or pace; or
      3. repeated episodes of decompensation, each of extended duration.

*Id*. After considering this listing, the ALJ concluded that the Plaintiff did not meet the requirements of part B. Tr. 869-870. Specifically, the ALJ found the Plaintiff had only mild restrictions in activities of daily living; moderate difficulties in social functioning; and; moderate limitations with regard to concentration, persistence, and/or pace.

With regard to her activities of daily living, the record makes clear that the Plaintiff lived alone with her teenage son, who was in and out of treatment during much of the relevant time period. She was also able to perform some household chores, do laundry, prepare simple meals, act as a volunteer training coordinator for the First Responders and Emergency Response ("FRER") teams of Crawford County[2], shop independently, handle personal finances, attend church weekly, use Facebook weekly, and text message friends weekly. Tr. 185-192, 215-219, 413, 422, 1105. Thus, the evidence clearly supports the ALJ's finding of only mild restrictions in this category.

Similarly, the evidence supports that ALJ finding of moderate limitations in social functioning. We note that Plaintiff reported a poor relationship with her son, but indicated that she got along with people at church and co-workers. Tr. 422. She also admitted to being active on

---

[2] In that capacity, she organized and taught several training sessions to various groups as well as helped assist in actual search and rescue events. Tr. 413.

Facebook, texting her friends on a weekly basis, and attending church services weekly.  Ms. Smith concluded that the Plaintiff could tolerate superficial contact and interact socially with others in a reasonably consistent and appropriate manner, as shown by her ability to coordinate that FRER team.  Tr. 413.  Further, Dr. Efird concluded that the Plaintiff could communicate and interact in a reasonable and socially adequate, intelligible, and effective manner, assessing her with mild to moderate limitations in the area of interacting appropriately with the public, supervisors, and co-workers and responding to usual work situations and changes in routine work setting.  Tr. 1100.

Likewise, substantial evidence supports the ALJ's conclusion that the Plaintiff had only moderate limitations with regard to concentration, persistence, and pace.  Dr. Spray assessed the Plaintiff with borderline to low average intellectual functioning.  Tr. 424.  He observed that she worked at a slow pace, but persisted well and gave adequate effort.  Tr. 425.  Ms. Smith also indicated that the Plaintiff had the ability to concentrate and maintain adequate persistence and pace.  Tr. 413.  In addition, Dr. Efird found her to have the capacity to perform basic cognitive tasks required for basic work-like activities, to track and respond adequately in the evaluation, to complete most tasks during the evaluation, to persist, and to perform basic work-like tasks within a reasonable time frame.  Tr. 877-878.

Finally, the ALJ properly concluded the record was void of any evidence to indicate that the Plaintiff had suffered episodes of decompensation.  The term repeated episodes of decompensation of extended duration is defined as three episodes in one year, or an average of once every four months, each lasting at least two weeks.  *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00(C)(4).  As previously stated, the Plaintiff was treated on an outpatient basis February, 2007 through May, 2008, September, 2008 through May, 2009, and October, 2009 through August, 2011.  There is no evidence to indicate that her condition ever warranted inpatient treatment.

Further, we note that many of the Plaintiff's treatment set backs were the result of her own treatment non-compliance or family situations that exacerbated her depressive symptoms. *See Dunahoo v. Apfel*, 241 F.3d 1033, 1038 (8th Cir. 2001) (holding that claimant's failure to follow prescribed course of treatment weighed against credibility when assessing subjective complaints of pain); *Banks v. Massanari*, 258 F.3d 820, 826 (8th Cir. 2001) (finding depression not severe under similar circumstances).

### C. RFC Determination:

Next, the Plaintiff contests the ALJ's RFC determination. RFC is the most a person can do despite that person's limitations. 20 C.F.R. § 404.1545(a)(1). A disability claimant has the burden of establishing his or her RFC. *See Masterson v. Barnhart*, 363 F.3d 731, 737 (8th Cir. 2004). "The ALJ determines a claimant's RFC based on all relevant evidence in the record, including medical records, observations of treating physicians and others, and the claimant's own descriptions of his or her limitations." *Davidson v. Astrue*, 578 F.3d 838, 844 (8th Cir. 2009)*; see also Jones v. Astrue*, 619 F.3d 963, 971 (8th Cir. 2010) (ALJ is responsible for determining RFC based on all relevant evidence, including medical records, observations of treating physicians and others, and claimant's own description of his limitations). Limitations resulting from symptoms such as pain are also factored into the assessment. 20 C.F.R. § 404.1545(a)(3). The United States Court of Appeals for the Eighth Circuit has held that a "claimant's residual functional capacity is a medical question." *Lauer v. Apfel,* 245 F.3d 700, 704 (8th Cir. 2001). Therefore, an ALJ's determination concerning a claimant's RFC must be supported by medical evidence that addresses the claimant's ability to function in the workplace." *Lewis v. Barnhart,* 353 F.3d 642, 646 (8th Cir. 2003); *see also Jones*, 619 F.3d at 971 (RFC finding must be supported by some medical evidence).

9

Plaintiff contends that the ALJ's RFC assessment is improper because it does not account for her ability to perform tasks only at her own pace; inability to comprehend responsibility for her actions; and, inability to change her behavior to accommodate the social norms of responsibility, reliability, and interpersonal engagement. Further, she argues that her behavioral abnormalities will escalate under the normal stresses of a work environment.

At the onset, we note that the Plaintiff does not contest the ALJ's finding that she could perform sedentary work with certain postural and environmental limitations. She only contests the ALJ's determination she can perform simple, routine, and repetitive tasks in a setting where interpersonal contact is incidental to the work performed; the complexity of the tasks is learned and performed by rote, with few variables and little judgment; and, the supervision required is simple, direct, and concrete. Tr. 871. Therefore, although we do find substantial evidence to support the physical findings included in the RFC, we will not address them in this opinion.

After reviewing the entire record, the undersigned is of the opinion that substantial evidence supports the ALJ's RFC determination. Counselors and doctors at WACGC treated the Plaintiff for major depressive disorder and parent/child relationship problems between February, 2007 and May, 2008. Tr. 356-369, 405-414. Records indicate that the Plaintiff's teenage son had some behavioral problems that had resulted in the involvement of the Department of Human Services. His behavior and the legal problems that ensued appear to have greatly influenced her mental status. Tr. 240, 254-260, 356-360, 405. *See Banks v. Massanari*, 258 F.3d 820, 826 (8th Cir. 2001) (finding situational depression not severe). Other situational factors such as her grandmother's stroke and inability to help her out financially also exacerbated her mental impairments. Tr. 405. Treatment notes also reveal that her condition responded to the medication prescribed, with numerous reports of doing well, very well, and even great at times. Tr. 361, 362-

363, 364, 365, 408-412.  *See Patrick v. Barnhart*, 323 F.3d 592, 596 (8th Cir. 2003) (holding if an impairment can be controlled by treatment or medication, it cannot be considered disabling). However, they ultimately discharged her from treatment in August 2008, due to non-compliance and "failure to make any substantial progress" during her treatment.  Tr. 408-414.  *See Dunahoo*, 241 F.3d at 1038 (8th Cir. 2001) (holding that claimant's failure to follow prescribed course of treatment weighed against credibility when assessing subjective complaints of pain).

In April, 2008, Dr. Kathleen Kralik diagnosed the Plaintiff with provisional ADHD, depressive disorder not otherwise specified (likely underlying dysthymia exacerbated by personality issues, situational stressors, and medical factors), anxiety disorder not otherwise specified, parent-child relational problems, and personality disorder.  She concluded the Plaintiff was somewhat impaired with regard to her capacity to carry out activities of daily living and daily adaptive functioning, communicate and interact in a socially adequate manner, cope with the typical mental/cognitive demands of basic work-like tasks, and complete work-like tasks within an acceptable time frame.  Dr. Kralik also noted that her ability to attend and sustain concentration on basic tasks and sustain persistence in completing tasks seems problematic, but voiced her strong suspicion that the Plaintiff exaggerated her symptoms.  Perhaps the most damaging, however, is the fact that the Plaintiff told Dr. Kralik she could do some type of home-based work that would allow some flexibility in attending to her son's care.

In July, 2008, Dr. Winston Brown, a non-examining, consultative psychologist, reviewed Plaintiff's medical records and completed a mental RFC assessment.  Tr. 386-403.  He concluded that the Plaintiff was moderately limited in the following areas: carrying out detailed instructions, maintaining concentration for extended periods, sustaining an ordinary routine without special supervision, completing a normal work-day and work week without interruptions from

11

psychologically based symptoms, performing at a consistent pace without an unreasonable number and length of rest periods, accepting instructions and responding appropriately to criticism from supervisors, responding appropriately to changes in work setting, and setting realistic goals or making plans independently of others.

In September, 2008, counselor Susan Smith at WACGC rated her compliance with treatment as moderate for medication management and relatively poor concerning individual therapy. Tr. 413. Ms. Smith noted that the Plaintiff headed a volunteer training program for the FRER team of Crawford County, had a few friends, did not socialize regularly outside of her volunteer work, and exhibited some personality traits that made it difficult for her to develop deep emotional relationships. However, she found her capable of communicating and socializing on a superficial basis. Tr. 413. Ms. Smith also acknowledged Plaintiff was able to understand at least simple instructions, persist, and complete routine and simple tasks in a timely manner. Further, in her capacity as training coordinator of the FRER team, she was able to keep an adequate pace, even in emergencies. Tr. 413.

Plaintiff began treatment at Day Springs in September, 2008. Providers diagnosed her with major depression, mood disorder, post-traumatic stress disorder, borderline personality disorder, and mental retardation. Treatment consisted of both medication management and individual therapy. Tr. 452-482, 517-543, 703-761. As previously stated, records reveal that her son's behavioral problems and treatment non-compliance negatively affected her depression. Tr. 453-474, 480-482, 535-543. Although records do reveal some benefits from medication management, in November 2008, the Plaintiff stopped her medications and refused to resume them several weeks. Tr. 478, 479. Moreover, in May 2009, she became non-compliant with therapy. Tr. 517-525.

In January, 2009, Dr. Robert Spray conducted a psychological evaluation. Tr. 421-427. Although he did not complete an RFC assessment, testing did reveal a full scale IQ of 77, placing her in the borderline range of intellect. Further, while her pace was noted to be slow, she persisted well and gave adequate effort. Dr. Spray diagnosed her with mood disorder not otherwise specified, and personality disorder not otherwise specified with borderline, histrionic, and passive-aggressive features. He also noted that she was pessimistic, resentful, and cynical and felt that seeking out further help was futile because treatment to date had not adequately addressed her physical and emotional issues.

In May, 2009, treatment records from John Skelly, a counselor at Day Spring, indicate that the Plaintiff was doing well on medication, sleeping well, alert, and interpersonally engaged. Tr. 526-534. Therapeutic as well as medication management records reveal that she was making some progress in treatment, open to more suggestions, more involved with neighbors and with her volunteer positions, and working with DHS rather than pulling against them. Further, her mood was much more elevated and much more manageable. Moreover, she was doing well on the medications prescribed. Tr. 475.

In September, 2009, in spite of having noted the Plaintiff's treatment non-compliance only two months earlier with no intervening therapy sessions, Mr. Skelly completed a medical source statement. Tr. 513-515. He indicated that she had marked limitations with regard to completing a normal workday and workweek without interruption from psychologically based symptoms, performing at a consistent pace without an unreasonable number and length of rest periods, interacting appropriately with the general public, traveling in unfamiliar places or using public transportation, and setting realistic goals or making plans independently of others. Tr. 513-515. He also noted moderate limitations in maintaining attention and concentration for extended

13

periods, working in coordination with or proximity to others without being distracted by them, making simple work related decisions, and accepting instructions and responding appropriately to criticism from supervisors. Mr. Skelly stated that Plaintiff was not limited greatly; however, she did get very anxious and defensive when being supervised by bosses. He stated that Plaintiff worked well at her own pace, but she tired easily and often felt disrespected and judged unfairly. Mr. Skelly indicated that Plaintiff suffered from physical pain and a mood disorder, resulting in mood fluctuations that varied from highly engaged to highly angry and withdrawn. He stated that she was working to manage those highs and lows. He then rated her capacity for employment as marginal. Tr. 513-15. However, we do not find that his treatment notes support such a restrictive RFC. Further, his statement that the Plaintiff was not "limited greatly" contradicts his assessment. See *Renstrom v. Astrue*, 680 F.3d 1057, 1064 (8th Cir. 2012), quoting *Perkins v. Astrue*, 648 F.3d 892, 897 (8th Cir. 2011) (holding deference to treating doctor not appropriate when opinion inconsistent with other substantial evidence).

In October, 2009, a mental evaluation performed by Dr. Bolyard indicates that the Plaintiff was again experiencing lack of insight and social isolation. Tr. 759-761. Dr. Bolyard diagnosed her with adjustment disorder with disturbance of mood, major depression, and dysthymic disorder. He opined that she might benefit from antidepressant therapy, but reported she was unable to afford any medication.[3] Dr. Bolyard also stated that her degree of social stress in combination with her cognitive distortions could be major barriers to the efficacy of antidepressants.

Later that month, however, stressors related to her son became overwhelming. Tr. 759-760. He was placed in a Christian Youth Home, and the Plaintiff felt as though she were having

---

[3] However, we note that the Plaintiff was receiving her medications through the Patient Assistance Program. Tr. 368-369, 763-764.

a nervous breakdown. Although Mr. Skelly felt she would benefit from having a case manager, Plaintiff refused. Mr. Skelly noted, "[s]he needs to work with [her] treatment team and not just stay in the victim role." In December, 2009, Mr. Skelly indicated that the Plaintiff did not like her current situation, but had made no adaptations. Tr. 749-753.

In March, 2010, Plaintiff's mood had improved. Tr. 744-748. Records indicate that her son had returned home, and she was coping much better with life. Some progress was noted.

By October, 2010, Plaintiff's mood had turned to help rejecting. Tr. 733-735. She struggled with disciplining and dealing with her teenage son. Although she was compliant with therapeutic appointments, she was not compliant with the goals and objectives of said treatment. In November, 2010, the court ordered her son to attend school. Tr. 724. Plaintiff was upset and vowed to have him returned to home schooling.

In January, 2011, Dr. Bolyard noted that the Plaintiff was tolerating her medications well. Tr. 723. She was both alert and interpersonally engaged. Vashonda Eason, a counselor at Day Spring, indicated that she had completed her first treatment goal, which was to develop a trust bond with her therapist. However, the other treatment goals remained unmet. Tr. 711-715, 718-722. Plaintiff's son moved to Texas in June, 2011 to live with relatives, and Plaintiff appears to have been compliant with treatment. Tr. 707-708. However, by August, she was again minimizing treatment goals and objectives, stating she would never be happy. Ultimately, she was discharged from services due to noncompliance. Tr. 703-761. A notation from Day Spring in 2013, when the ALJ attempted to obtain an RFC assessment from her providers there reveals that the Plaintiff did not seek out further treatment.

On September 12, 2013, Dr. Efird performed a consultative mental evaluation. Tr. 1099-1105. After assessing her with major depressive disorder and panic disorder, he found that she

retained the ability to adequately function, interact socially, perform basic cognitive tasks, complete tasks within an acceptable time frame, concentrate, persist, and keep pace. Dr. Efird concluded that she was mildly to moderately limited with regard to making judgments on complex work-related decisions; interacting appropriately with the public, co-workers, and supervisors; and, responding appropriately to usual work situations and change in routine work setting.

The ALJ gave significant weight to Dr. Bolyard's observations of the Plaintiff's treatment noncompliance; Dr. Kralik's notation concerning her exaggeration of symptoms; Mr. Skelly's notation that the Plaintiff was not "limited greatly;" and, Dr. Efird's conclusion that the Plaintiff was impaired by mental limitations but was able to functionally adapt, socially interact, concentrate, persist, and keep pace. After reviewing the entire record, we find that the ALJ assigned the proper weight to the medical opinions provided. As previously noted, Mr. Skelly's assessment is both internally contradicted and contradicted by treatment notes documenting improvement while complaint with treatment.

While we do note that the Plaintiff suffers from a personality disorder, given her help rejecting attitude, treatment noncompliance, and failure to seek out treatment after 2011, we do not find that her condition is severe enough to warrant additional limitations in the RFC. Accordingly, we find substantial evidence supports the ALJ's RFC determination.

### D. Step 5 Analysis:

Finally, the Plaintiff avers that the ALJ failed to meet his burden at Step 5 of the sequential analysis. It is her argument that the hypothetical questions posed to the vocational expert did not contain all of her limitations, rendering the vocational expert's testimony null and void. However, "[t]he ALJ's hypothetical question to the vocational expert needs to include only those

impairments that the ALJ finds are substantially supported by the record as a whole." *Lacroix v. Barnhart*, 465 F.3d 881, 889 (8th Cir. 2006) (quotation and citation omitted).

Here, the ALJ's hypothetical question included all of the Plaintiff's limitations found to exist by the ALJ and set forth in the ALJ's description of the Plaintiff's RFC.  Therefore, based on our previous conclusion, *see supra* Part C, that the ALJ's findings of Plaintiff's RFC are supported by substantial evidence, we hold that the hypothetical question was therefore proper, and the VE's answer constituted substantial evidence supporting the Commissioner's denial of benefits.  *Id.*

## V.     Conclusion:

Accordingly, having carefully reviewed the record, the undersigned finds substantial evidence supporting the ALJ's decision denying the Plaintiff benefits, and thus the decision should be affirmed.  The undersigned further finds that the Plaintiff's Complaint should be dismissed with prejudice.

DATED this 27th day of April, 2015.

/s/ *Mark E. Ford*
HONORABLE MARK E. FORD
UNITED STATES MAGISTRATE JUDGE